# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

———————————

**No. ACM 38934**

———————————

**UNITED STATES**
*Appellee*

**v.**

**Cody D. BOND**
Airman (E-2), U.S. Air Force, *Appellant*

———————————

Appeal from the United States Air Force Trial Judiciary

Decided 7 June 2017

———————————

*Military Judge:* Marvin W. Tubbs II.

*Approved sentence:* Dishonorable discharge, confinement for 10 years, and reduction to E-1. Sentence adjudged 2 July 2015 by GCM convened at Joint Base San Antonio-Lackland, Texas.

*For Appellant:* Major Lauren A. Shure, USAF.

*For Appellee:* Major Meredith L. Steer, USAF; Gerald R. Bruce, Esquire.

Before MAYBERRY, HARDING, and C. BROWN, *Appellate Military Judges*.

Judge HARDING delivered the opinion of the Court, in which Judge C. BROWN joined. Senior Judge MAYBERRY file a separate opinion concurring in part and dissenting in part.

———————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 18.4.**

———————————

HARDING, Judge:

Contrary to his pleas, Appellant was convicted by officer members of one specification of sexual assault in violation of Article 120(b), Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920(b), and two specifications of communicating a threat in violation of Article 134, UCMJ, 10 U.S.C. § 934.[1] Consistent with his plea, Appellant was convicted of one specification of making a worthless check by dishonorably failing to maintain sufficient funds in violation of Article 134, UCMJ, 10 U.S.C. § 934. Appellant was sentenced to a dishonorable discharge, confinement for ten years, and reduction to E-1. The convening authority approved the sentence as adjudged.

Appellant asserts six assignments of error: (1) Whether the evidence for the specifications of communicating a threat is legally and factually sufficient; (2) Whether the evidence for the specification of sexual assault is legally and factually sufficient;[2] (3) Whether the military judge's reasonable doubt instruction was error;[3] (4) Whether the military judge abused his discretion in permitting the Government access to and subsequently admitting a portion of Appellant's medical record; (5) Whether it was error for the victim's unsworn statement to reference multiple "assaults" when Appellant was convicted of only one sexual assault; and (6) Whether the presumptively unreasonable delay between announcement of sentence and the convening authority's action warrants relief.

We conclude the evidence underlying Appellant's Article 134, UCMJ, convictions for communicating a threat with the words "if I stand far away with a high-powered enough rifle, I can still hurt her without breaking the rules" is factually insufficient. We thus set aside the finding of guilt for that specification and reassess the sentence. Finding no further error, we affirm the remaining convictions.

---

[1] Appellant was acquitted of separate specifications of sexual assault in violation of Article 120(b), UCMJ, 10 U.S.C. § 920(b), and communicating a threat in violation of Article 134, UCMJ, 10 U.S.C. § 934.

[2] Raised pursuant to *United States v. Grostefon,* 12 M.J. 431 (C.M.A. 1982).

[3] Appellant did not object to this instruction at trial. We thus summarily reject this assignment of error pursuant to *United States v. McClour*, 76 M.J. 23 (C.A.A.F. 2017) (finding no plain error where a military judge provided the instruction without defense objection).

## I. BACKGROUND

Appellant and KB were married in May of 2013, less than one year after they met. Appellant and KB struggled financially throughout their marriage and frequently argued over money. After the birth of their daughter in April 2014, they moved in with KB's parents in order to save money. The friction over finances, however, continued.

At a post-partum checkup in early June of 2014, KB was advised by her doctor that she could resume sexual activity. Later that evening after going to bed, Appellant kissed KB to indicate he wanted to have sexual intercourse. KB, however, expressed that she was not interested and the couple went to sleep. Later that same night, Appellant began kissing KB again. Although KB explained to Appellant that she was not ready, she eventually agreed to engage in sexual activity with her husband. Shortly after Appellant and KB had begun to have sex, KB told Appellant that it hurt. Appellant requested that she relax and KB agreed to continue. After feeling pain again, KB told Appellant to stop. Appellant, however, did not stop. He continued despite KB's clear communication to him that she was no longer consenting.

On the evening of 11 June 2014, Appellant and KB got into an argument over "money going missing" that escalated to the point where KB's father intervened to calm both of them down. The same argument reignited both the next morning before Appellant went to work and again upon his return home. That evening, as the argument with KB continued, Appellant began to pack some of his personal items as he had decided to leave his in-laws' house. As he packed he asked his mother-in-law, PB, for his gun. Due to Appellant's prior suicidal ideations and his physician's instructions that Appellant not be allowed access to his gun, PB declined to give Appellant his gun.

Eventually Appellant, KB, and KB's parents were all in the library of KB's parents' house. The atmosphere remained tense and combustible. At that point, in the presence of both KB and her parents, Appellant told KB, "you're lucky I don't have my gun right now." KB testified that as Appellant said this "he was just staring [her] down, and there was just this look in his eyes. [H]is hands were balled, he was kind of shaking, and his teeth were clenched." KB furthered testified that she felt scared and that she "was lucky he didn't have [the gun] at that moment."

After hearing Appellant's statement, KB's father instructed both his daughter and Appellant to sit down in order to discuss their problems calmly. When Appellant failed to comply, KB pushed him into a chair. Appellant then

called his mother and placed the call on a speaker phone. His mother then disclosed that earlier in the day, Appellant had remarked to her that he wanted to or could "kill everyone" referring to KB and her family.[4] KB's mother then told Appellant that he had made their home unsafe and that he needed to leave. Given Appellant's prior history of suicidal ideation, KB's parents decided to take Appellant to the emergency room. Prior to departing, Appellant called a friend of his and also placed this call on a speaker phone. Appellant told his friend "I threatened to kill my wife" and that he was going to the emergency room.

At the emergency room, Appellant was evaluated for both suicidal and homicidal ideation. Appellant's medical records from that night provide the following summary:

> Upon arrival to ED[5] p[atient] expressed to ED staff his intention to kill his in-laws and his wife, and if given a chance he will kill them when discharged in one week. On evaluation p[atient] continues to express strong urges of homicidal thoughts toward his wife and in-laws. P[atient] reported he intends to carry on this plan to kill his in-laws/wife after he gets discharge [sic]. P[atient] denied suicidal thoughts.[6]

By December of 2014, Appellant and KB were going through divorce and child custody proceedings. Appellant was subject to a restraining order. When interacting with Senior Airman (SrA) VR, a co-worker, Appellant often playfully asked her, "Do you want to fight me?" SrA VR would always tell him no. On this December day, after again being asked if she wanted to fight him, SrA VR questioned Appellant as to why he always asked her that. Appellant replied: "[A]ll the women in my life have been hurting me, so I want to hurt one back." Appellant continued by explaining that "the one I want to hurt, I can't get close enough to because of the restraining order, but I know if I get a high-powered enough rifle, I *could* reach her." (Emphasis added). SrA VR subsequently reported Appellant's remarks to their supervision.

---

[4] This statement by Appellant was the basis for another specification of communicating a threat. The members acquitted Appellant of that specification.

[5] "ED" as used in the medical records is an apparent abbreviation for "Emergency Department."

[6] The access to and admission of this portion of Appellant's medical record is what is at issue with regard to Appellant's fourth assignment of error as detailed above.

## II. DISCUSSION

### A. Legal and Factual Sufficiency

Appellant challenges the legal and factual sufficiency of the evidence supporting the two convictions for communicating a threat and the conviction for sexual assault. We review both legal and factual sufficiency de novo. *United States v. Beatty*, 64 M.J. 456, 459 (C.A.A.F. 2007). The test for legal sufficiency of the evidence is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324 (C.M.A. 1987); *see also United States v. Humpherys*, 57 M.J. 83, 94 (C.A.A.F. 2002). The term "reasonable doubt" does not mean that the evidence must be free from conflict. *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt." *Turner*, 25 M.J. at 325. In conducting this unique appellate role, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). While we must find that the evidence was sufficient beyond a reasonable doubt, it "does not mean that the evidence must be free of conflict." *United States v. Galchick*, 52 M.J. 815, 818 (A.F. Ct. Crim. App. 2000).

### 1. Communicating a Threat

"You're lucky I don't have my gun." "If I stand far away with a high-powered enough rifle, I can still hurt her without breaking the rules." These words, or words to those effects, form the basis for the two convictions for wrongfully communicating threats against KB.

The United States Court of Appeals for the Armed Forces (CAAF) has emphasized that the offense of communicating a threat consists of both an objective and subjective prong, providing the following legal elements and framework for analyzing whether an individual has communicated a threat as proscribed by Article 134, UCMJ, 10 U.S.C. § 934:

> (1) That the accused communicated certain language [that a reasonable person would understand as] expressing a present de-

termination or intent to wrongfully injure the person, property, or reputation of another person, presently or in the future;

(2) That the communication was made known to that person or to a third person;

(3) That the communication was wrongful [in that the speaker intended the statements as something other than a joke or idle banter, or intended the statements to serve something other than an innocent or legitimate purpose]; and

(4) That . . . the conduct of the accused was to the prejudice of good order and discipline . . . or . . . of a nature to bring discredit upon the armed forces.

*United States v. Rapert,* 75 M.J. 164, 169 (C.A.A.F. 2016).

The critical question as to each of Appellant's statements is whether the evidence supports that Appellant communicated "a present determination or intent to injure" KB. When analyzing whether a communication constitutes a present determination or intent to injure under this first element and objective prong, "the existence of a threat should be evaluated from the point of view of a reasonable [person]." *United States v. Phillips,* 42 M.J. 127, 130 (C.A.A.F. 1995). In conducting this objective evaluation, "both the circumstances of the utterance and the literal language must be considered." *United States v. Cotton*, 40 M.J. 93 (C.M.A. 1994). Both the text and context of the statement matter.

Our jurisprudence has long recognized that "[a] declaration made under circumstances that reveal it to be in jest or for an innocent or legitimate purpose, or which contradict the expressed intent to commit the act, does not constitute this offense." *Manual for Courts-Martial*, pt. IV, ¶ 110.c (2012). Even when the literal language appears to constitute a threat, "the surrounding circumstances may so belie or contradict the language of the declaration as to reveal it to be a mere jest or idle banter." *United States v. Gilluly,* 32 C.M.R. 458, 461 (C.M.A. 1963). Conversely, the context can transform and import a present intent to injure to an otherwise seemingly innocuous or qualified statement. "Divorcing [the words] from their surroundings and their impact on the intended subject is illogical and unnatural. Legal analysis of a threat must take into account both the words used and the surrounding circumstances. Without such a subtle examination absurd results might arise defeating both the text and purpose of paragraph 110.b. of the *Manual for Courts-Martial.*" *United States v. Brown*, 65 M.J. 227, 232 (C.A.A.F. 2007).

So while it is clear that the words alleged to constitute a threat are not to be considered in a vacuum, "the words certainly matter because they are the starting point in analyzing any possible threat." *Id.* at 231. For example, our

superior court "has consistently ruled that examination of threats under Article 134, UCMJ, must pay due regard to any concretely expressed contingency associated with a threat, while remaining aware that all communication takes place within a context that can be determinative of meaning." *Id.*

In support of his argument, and highlighting the contingencies expressed in his statements, Appellant cites *United States v. Shropshire*, 43 C.M.R. 214 (C.M.A. 1971), a case where the threat relied on an expressed contingency. In that case an inmate, in response to a comment from a guard, stated, "I have more muscle in my little finger than you have in your whole body and *if you take this restraining gear off, I'll show you what I will do to you.*" (Emphasis added). The court held in that case that "the words uttered expressed a contingency that neutralized the declaration, since there was not a reasonable possibility the uncertain event would happen . . . [No] reasonable guard would have removed the restraining gear in order to permit an attack on himself." *Id.* at 215. The CAAF has also held that "if the threatened injury is stated to be contingent on the occurrence of an event that obviously cannot take place, an accused is not criminally liable." *Phillips,* 42 M.J. at 129.

Appellant argues that the statement "you're lucky I don't have my gun" did not contain an actual threat to harm anyone and that there was no reasonable possibility that he would have access to his gun, the contingency expressed in this case. The contingency, Appellant reasons, neutralized the threat. For these reasons, Appellant asserts the words were legally insufficient to state an offense.

But this argument ignores context. In *Brown*, 65 M.J. at 231, the court noted that the words uttered in that case facially "expressed a contingency that neutralized the declaration," yet emphasized that "'so long as the words uttered could cause a reasonable person to believe he was wrongfully threatened' contingent words could communicate a threat under Article 134, UCMJ." *Id.* (quoting *Shropshire*, 43 C.M.R. at 215). The following hypothetical proffered by the court in *Brown* is helpful to analyzing the words and surrounding circumstances of the "you're lucky I don't have my gun" statement by Appellant.

> If a drunken, forty-year-old bar patron wields an axe while running around menacingly shouting that if he were twenty years old he would kill a proximate individual, a legalistic analysis of the words of the threat would result in a conclusion that no threat existed. A forty-year old can never be a twenty-year-old and thus the impossible contingency would presumably negate the threat. This, however, is somewhat nonsensical. It belies the fact that the individual is nonetheless behaving and speaking in a threatening manner despite the stated ex-

7

plicit contingency that seemingly limits the forty-year-old's ability to consummate the threat.

*Id.*

Likewise, there is evidence Appellant was behaving and speaking in a threatening manner during the June 2014 incident. The facts and nature of the threat in *Brown* are also somewhat analogous to this case. In *Brown* the literal words of the threat consisted of a statement that the appellant would kill his girlfriend if their son were not present. The impossibility or unlikelihood of this eventuality occurring was uncertain as was the matter of who exactly had the power to make the contingency occur or prevent it from occurring. In this case, it is the presence of Appellant's gun and his access to it that is uncertain. The court in *Brown* went on to say that "[e]ven if one concludes the words themselves are not sufficient to constitute an unlawful threat, the combination of words and circumstances [were] sufficient." *Id.* at 232.

The circumstances surrounding the utterance "you're lucky I don't have my gun" are compelling. Appellant and KB were in day two of a heated argument over money and Appellant had just asked his mother-in-law for his gun. When Appellant told KB that she was lucky he didn't have his gun, he was staring directly into her eyes, his fists balled, his teeth clenched, and his body shaking. KB testified that she was scared. We find that the words "you're lucky I don't have my gun" and the surrounding circumstances, viewed in the light most favorable to the prosecution, provided sufficient evidence for a reasonable factfinder to find all the essential element of expressing a present determination or intent to wrongfully injure KB, presently or in the future, beyond a reasonable doubt.

The evidence was also legally sufficient as to Appellant's subjective intent. Appellant had made a comment to his mother earlier in the day that he wanted to kill KB and her parents. Moments after Appellant uttered the words at issue, over a speaker-phone and after Appellant had exclaimed "I did it," his mother revealed the statement from earlier in the day. Appellant practically bragged to his friend over the speakerphone that he had just threatened to kill his wife. The combination of the statements and actions by Appellant during his argument with KB in her parents' home that evening were legally sufficient as to both the objective and subjective prongs of communicating a threat. Furthermore, after our independent review of the record and making allowances for not personally observing the witnesses, we are ourselves convinced beyond a reasonable doubt that Appellant communicated a threat when he told KB that she was lucky he did not have his gun.

The December utterance "if I stand far away with a high-powered enough rifle, I *can* still hurt her without breaking the rules" not only contained a contingency but also the word "can" or "could." (Emphasis added). In *Cotton,* 40

M.J. at 95, the pivotal question was whether the appellant's statement "I'd kill" my first sergeant communicated a present determination or intent to kill. The court found the literal meaning of the utterance problematic. The court noted that the appellant did not say "I'm going to kill" but said "I'd kill [him] with no problem." The word "I'd" is a contraction for "I would" or "I should." Critically, the court observed that "[t]he words 'would' and 'should' express a condition antithetical to a present determination to harm another." *Id.* at 95. In the context of a report of distress at the mental health clinic, the court held as a matter of law that the statement did not constitute communication of a threat. We note that even though the court identified a problem with the literal language of the threat in *Cotton*, they still considered the context before finding the statement did not constitute a threat.

In this case, Appellant expressed that he "could" reach her if he had a high-powered enough rifle. The literal and plain meaning of "can" or "could" only expresses capability or possibility, not a present determination to do something either presently or in the future. On cross-examination, SrA VR agreed that Appellant did not say "I am going to take her out," "I am going to kill her," or "I will kill her." The words used by Appellant here were just as "antithetical to a present determination to harm another" as the ones uttered in *Cotton*. Unlike *Cotton*, where the context was a report of distress to a mental health provider, Appellant made this statement to a co-worker. Absent, however, is evidence of volatile surrounding circumstances similar to that of June 2014 and the utterance "you're lucky I don't have my gun." Indeed, SrA VR agreed that Appellant could have been joking when he made the statement but that she reported the statement out of an abundance of caution. After weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, we are not convinced of Appellant's guilt beyond a reasonable doubt.[7]

### 2. Sexual Assault

Appellant also challenges the legal and factual sufficiency of sexual assault specification. To sustain a conviction for sexual assault, the Government was required to prove: (1) that Appellant committed a sexual act upon KB, to wit: penetrating KB's vulva with his penis; (2) that Appellant did so by causing bodily harm to KB to wit: penetrating her vulva with his penis; and (3) that Appellant did so without the consent of KB. *See* Department of the Army Pamphlet 27-9, *Military Judges' Benchbook*, 3-45-14 (10 Sep. 14). We

---

[7] Because we find the evidence for this specification factually insufficient, we do not address legal sufficiency.

find there is sufficient evidence to convince a rational trier of fact beyond a reasonable doubt that the Appellant is guilty of sexual assault. Furthermore, after our independent review of the record and making allowances for not personally observing the witnesses, we are ourselves convinced beyond a reasonable doubt.

**B. Appellant's Statement to Emergency Department Staff**

Appellant avers the military judge abused his discretion in permitting the Government access to his medical records and by subsequently admitting a portion of his medical record[8] in evidence, which included statements by him expressing a desire to kill KB and her parents upon his release from the hospital. We disagree. The military judge correctly found that an exception to the psychotherapist-patient privilege applied that permitted both disclosure and admission of the statements.

A military judge's ruling on whether to conduct an *in camera* review of and release material covered by Military Rule of Evidence (Mil. R. Evid.) 513 is reviewed for an abuse of discretion. *United States v. Clark*, 62 M.J. 195, 200 (C.A.A.F. 2005); *United States v. Chisum*, 75 M.J. 943, 946 (A.F. Ct. Crim. App. 2016). Similarly, a military judge's decision to admit or exclude evidence is reviewed for an abuse of discretion. *United States v. Harrow*, 65 M.J. 190, 201 (C.A.A.F. 2007) (citing *United States v. McCollum*, 58 M.J. 323, 335 (C.A.A.F. 2003)). "An abuse of discretion occurs when the trial court's findings of fact are clearly erroneous or if the court's decision is influenced by an erroneous view of the law." *United States v. Freeman*, 65 M.J. 451, 453 (C.A.A.F. 2008) (citing *United States v. Rader*, 65 M.J. 30, 32 (C.A.A.F. 2007)). However, when no objection is made, this court reviews a military judge's rulings in this regard for plain error. *United States v. Eslinger*, 70 M.J. 193, 197-98 (C.A.A.F. 2011).

There are two distinct yet related issues to be resolved: the propriety of government access to Appellant's records and whether statements made by Appellant were admissible. We will first address the access issue as the proverbial opening of the door during the cross-examination of KB is what interjected this matter into the trial.

During their cross-examination of KB, defense counsel asked whether KB was aware of Appellant's past suicidal ideation and hospitalization. This evidence would provide a basis for an inference in support of a Defense theory

---

[8] This record was created during Appellant's visit to the emergency department on 12 June 2014 and his subsequent stay at the hospital.

that when Appellant stated "you're lucky that I don't have my gun" he was referring to harming himself. In consideration of both the objective and subjective prongs for communicating a threat, this evidence was relevant. It could be considered as to whether Appellant had expressed a present determination or intent to harm himself or KB. This evidence also went to whether or not Appellant had the intent to wrongfully communicate a threat. Trial counsel objected to admission of the evidence on the grounds of a lack of notice of a mental responsibility defense and that this evidence amounted to Appellant placing his mental state at issue. Arguing that the door had been opened, trial counsel requested access to Appellant's mental health and medical records that pertained to suicidal ideation. Defense counsel argued the door had not been opened as they were not putting forth a lack of mental responsibility defense. The Defense further stated that they believed the Government already had these records.[9]

Although the Appellant never specifically asserted and the military judge never specifically concluded that all the requested records were covered by the psychotherapist-patient privilege, all the trial participants proceeded on the implicit assumption that they were. The military judge concluded that although the Defense had not raised the defense of mental responsibility, they had offered evidence of Appellant's mental state (prior suicidal ideation) that had a tendency to directly rebut the element of present determination or intent to harm another. Having found that the evidence was offered for this purpose, the military judge correctly concluded that an exception to the psychotherapist-patient privilege applied. The military judge ordered the production of the records pursuant to Mil. R. Evid. 513(d)(7), finding that the Defense offered evidence concerning a mental condition in defense, extenuation, or mitigation and had the discretion to review the records in the interests of justice.

The Defense stated on the record that they had "no issue" with the military judge reviewing Appellant's medical record to see what was releasable. In fact, the Defense viewed the review by the military judge as a potential

---

[9] The Defense did not further describe why they believed that the Government had the subjected records and would have reviewed them. We note from the report of the preliminary hearing that a specification of communicating a threat for the statements made by Appellant to the emergency department on 12 June 2014 had been preferred and was reviewed by the preliminary hearing officer. This specification was dismissed prior to the arraignment but the preferral of the specification supports an inference that the Government was at least aware of some of the substance of what Appellant told the emergency department staff.

limit on what the Government might otherwise attempt to offer of records they already had. The Defense stated:

> So to make sure the record is clear on that and what our position was yesterday, we assumed that the Government actually remembered that they had these documents and that no door was really opened, because they already had this stuff at their disposal. But understanding now that this might limit the amount of information that their trying to use to go and redirect Mrs. [KNB], **we're fine with the Court looking at this and determining which amount is releasable.** And based on that, they can go and conduct their redirect after we finish our cross-examination.

(Emphasis added.)

On appeal Appellant urges this court to apply *United States v. Clark,* 62 M.J. 195, 200 (C.A.A.F. 2005) and conclude that the military judge erred in the release of Appellant's statements. The statements at issue here, however, are distinguishable from those at issue in *Clark*. In *Clark,* the court was examining the admission of statements made pursuant to a sanity board, which are compelled statements. *Clark*, 62 M.J. at 198. The statements contained in the redacted records of this case were not made in the course of a R.C.M. 706 sanity board, and thus are not subject to Mil. R. Evid. 302. Consistent with the decision to review the records in the first place, the military judge correctly found that the exception of Mil. R. Evid. 513(d)(7) also applied to a disclosure of a portion of those records.

Similarly, the military judge did not abuse his discretion when he permitted the Government to introduce statements that rebutted the idea that Appellant was not actually threatening his wife and her parents. Rebuttal evidence may be used to explain, repel, counteract, or disprove the evidence introduced by the opposing party. *United States v. Wirth*, 18 M.J. 214 (C.M.A. 1984.) That is exactly what these records did. This evidence, homicidal statements within hours of the threat at issue, however, was more than just Government rebuttal evidence. The evidence was directly relevant to the subjective prong of communicating a threat:

> That the communication was wrongful [in that the speaker intended the statements as something other than a joke or idle banter, or intended the statements to serve something other than an innocent or legitimate purpose].

These statements were direct evidence of the wrongfulness of Appellant's remark to KB and match the other statements made by Appellant that day wherein he repeatedly made reference to killing his spouse and his in-laws.

## C. Victim Impact Statement

Appellant asserts it was error for the victim's unsworn statement to reference multiple "assaults" when Appellant was convicted of only one sexual assault. We agree, but find that this minor error did not prejudice Appellant.

We ordinarily review a military judge's decision to admit sentencing evidence for an abuse of discretion. *United States v. Ediger*, 68 M.J. 243, 248 (C.A.A.F. 2010). When an issue is forfeited, however, we review for plain error. *United States v. Harcrow*, 66 M.J. 154, 156 (C.A.A.F. 2006). Regarding erroneously admitted sentencing evidence, the test for prejudice is whether "the error substantially influenced the adjudged sentence." *United States v. Sanders*, 67 M.J. 344, 346 (C.A.A.F. 2009).

Although KB did use the word "assaults" rather than "assault" in her unsworn statement, this was a minor error that did not draw an objection from Defense. The members understood what they convicted Appellant of and they were properly instructed on how to arrive at an appropriate sentence in this case. Specifically, the military judge instructed the members that Appellant was to be sentenced "only for the offenses of which he [had] been found guilty." There is no evidence that the members were misled by KB's use of a plural or that they otherwise adjudged a more severe sentence based on the use of the word "assaults." In short, we are convinced that this relatively minor error did not substantially influence the adjudged sentence.

## D. Post-Trial Delay

Appellant argues the presumptively unreasonable delay between announcement of sentence and the convening authority's action warrants relief. Appellant requests this court reduce his sentence to confinement in a meaningful way due to an unreasonable post-trial delay. We decline to do so.

The convening authority took action 152 days after the announcement of sentence and the end of trial. There is a presumption of unreasonable post-trial delay when the convening authority does not take action within 120 days of trial. *United States v. Moreno*, 63 M.J. 129, 142 (C.A.A.F. 2006). Appellant, however, does not allege a due process violation, but urges this court to exercise its power under Article 66(c), UCMJ, 10 U.S.C. § 866(c), to grant relief for the post-trial delay in this case. *United States v. Tardif,* 57 M.J. 219, 224 (C.A.A.F. 2002). In making our assessment, we are guided by factors enumerated in *United States v. Gay*, 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), aff'd, 75 M.J. 264 (C.A.A.F. 2016), with no single factor being disposi-

tive.[10] In their explanation of the reasons for the delay, the Government proffers that most of the delay occurred during the transcription of the proceedings and that the installation court reporters were already tasked with other court-martial proceedings to transcribe at the time Appellant's trial. Additionally, the Government notes that the victim provided matters which were then served on Appellant. Finally, we note that this case produced an 11-volume record for a trial that took place over seven days. We find no evidence of bad faith or gross indifference to the post-trial processing of this case where the standard was exceeded by 32 days. Having considered and weighed all the *Gay* factors, we conclude no extraordinary exercise of our Article 66(c), UCMJ, authority is warranted in this case.

**E. Sentence Reassessment**

Having dismissed a specification of communicating a threat, we now must decide whether we can accurately reassess Appellant's sentence based solely upon the findings on the affirmed communicated threat, sexual assault, and worthless check convictions, or instead if we must return this case for a rehearing.

This court has "broad discretion" when reassessing sentences. *United States v. Winckelmann*, 73 M.J. 11, 12 (C.A.A.F. 2013). Our superior court has repeatedly held that if we "can determine to [our] satisfaction that, absent any error, the sentence adjudged would have been of at least a certain severity, then a sentence of that severity or less will be free of the prejudicial effects of error." *United States v. Sales*, 22 M.J. 305, 308 (C.M.A. 1986). In determining whether to reassess a sentence or order a rehearing, we consider the totality of the circumstances with the following as illustrative factors: (1) dramatic changes in the penalty landscape and exposure, (2) the forum, (3) whether the remaining offenses capture the gravamen of the criminal conduct, (4) whether significant or aggravating circumstances remain admissible

---

[10] These factors include: (1) How long the delay exceeded the standards set forth in Moreno; (2) What reasons, if any, the Government set forth for the delay, and whether there is any evidence of bad faith or gross indifference to the overall post-trial processing of this case; (3) Keeping in mind that our goal under Tardif is not to analyze for prejudice, whether there is nonetheless some evidence of harm (either to the appellant or institutionally) caused by the delay; (4) Whether the delay has lessened the disciplinary effect of any particular aspect of the sentence, and is relief consistent with the dual goals of justice and good order and discipline; (5) Whether there is any evidence of institutional neglect concerning timely post-trial processing, either across the service or at a particular installation; and (6) Given the passage of time, whether this court can provide meaningful relief in this particular situation.

and relevant, and (5) whether the remaining offenses are the type with which we as appellate judges have the experience and familiarity to reliably determine what sentence would have been imposed at trial. *Winckelmann*, 73 M.J. at 15–16.

Examining the entire case and applying the considerations set out in *Winckelmann*, we are able to determine to our satisfaction that Appellant's sentence to confinement would have been at least eight years and six months without the error. This court has extensive experience in dealing with the offenses in this case and, as such, is cognizant of the types of punishment and levels of sentence imposed for offenses similar to those alleged against Appellant. This and the remaining circumstances surrounding this case establish that a rehearing on sentence is unnecessary.

The dismissal of one Article 134 communicating a threat specification reduces the penalty landscape and exposure by three years, leaving a maximum possible confinement of 33 years and six months. This does not represent a dramatic change in the penalty landscape and exposure.

More critical than the reduction in punishment exposure, however, is that Appellant no longer stands convicted of communicating a threat in December of 2014, a second threat to shoot KB six months after the threat made in June of 2014. Trial counsel's sentencing argument relied on Appellant's December statement to argue that the threat of harm to KB was persistent and "not going to go away soon." Trial counsel connected Appellant's statements to the emergency department staff to the December statement in the following way:

> Now, during opening statement I came before you and I went through a series of slides with you. I have another presentation for you today, but in this particular case I only have one slide for you, and it's this one. On evaluation, patient continues to express strong urges of homicidal thoughts to his wife and his in-laws. If discharged, he intends to carry out those plans. Now my intention throughout this discussion with you is to leave that in the backdrop because just like this discussion right now . . ., that's also in the backdrop of the minds of every single victim influenced by the accused's actions. It's in the backdrop when they're fearing that he's going to come to work and kill them all. It's something that is not going to go away soon.

Rather than being limited to arguing about a one-time outburst in June, the December threat enabled trial counsel to present Appellant as a persistent threat. Trial counsel also repeatedly reminded the members of the threats that Appellant had made and the fear reaction expressed by the wit-

nesses to those statements. In justifying his recommendation for confinement, trial counsel exhorted the members to adjudge lengthy confinement of at least a decade in order to protect society. The conviction for a second threat in December undoubtedly contributed to the adjudged sentence. We thus reassess the sentence as follows: a dishonorable discharge, confinement for eight years and six months, and reduction to E-1. We are satisfied that, absent any error, the adjudged sentence would have been at least this amount and that the reassessed sentence is appropriate for the remaining offenses.

## III. CONCLUSION

The finding of guilt to Specification 4 of the Additional Charge is **SET ASIDE** and **DISMISSED WITH PREJUDICE**. The remaining findings and sentence, as reassessed, are correct in law and fact, and are **AFFIRMED**. Article 66(c), UCMJ.

MAYBERRY, Senior Judge (concurring in part and dissenting in part):

I respectfully disagree with my colleagues' conclusion that the evidence underlying Appellant's December 2014 statement was factually insufficient to establish communication of a threat. To find it factually insufficient, they need only make an independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt. *See United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002)

As the majority states, legal analysis of a threat must take into account both the words used and the surrounding circumstances. *United States v. Brown*, 65 M.J. 227, 232 (C.A.A.F. 2007). At the time Appellant spoke these words, he had already threatened his wife and her parents at least once before (a charge for which this court has affirmed the finding of guilt), and was subject to a restraining order. The recipient of the statement, a co-worker SrA VR, knew of the restraining order because Appellant previously told her about it, stating it was due to him showing up at his in-laws' house late at night to see his child and they would not allow him to see the child. During that same conversation, Appellant told SrA VR that if they didn't let him see his child, he was going to kill them all. This is the context in which SrA VR interpreted the statements made by Appellant on the date in question.

On or about 22 December 2014, Appellant asked SrA VR, "Do you want to fight me," a question he had asked her before, but for some reason on this day, SrA VR pursued his reason for asking. Appellant tells her, "Well, I want to fight a woman . . . all the women in my life have been hurting me, so I want to hurt one back." When SrA VR says she is not one of those women, Appellant says: "Well, the one I want to hurt, I can't get close enough to be-

cause of the restraining order . . . . but I know if I get a high-powered-enough rifle, I could reach her." (The language charged was "if I stand far away with a high-powered enough rifle, I can still hurt her without breaking the rules" or words to that effect).

At that point, SrA VR became concerned for Appellant's wife's safety "[b]ecause that is not a thought that anybody should have. It's nothing anybody should say out loud." SrA VR also said "it sounded like a plan. It wasn't only mentioning somebody dying, but how they were going to die; so there was thought put into it."

Appellant's statement on 22 December was not conditional, it was a communication of a threat. His statement to SrA VR expressed a present intent to wrongfully injure his wife. The intent was not new, it was merely impacted by the physical limitations placed on him by the restraining order. He understood that his effort to effectuate his intent required him to take a different approach, and he had clearly assessed that one such method would be to use a high-powered weapon to shoot her from the distance required by the restraining order. He had a present intent to harm his wife and he made that intent known on 22 December 2014 in his conversation with SrA VR.

For these reasons, after considering the facts and circumstances of this case, I am persuaded that Appellant's words on or about 22 December 2014 communicated a present intent to wrongfully injure his wife, presently or in the future; that he uttered those words to SrA VR not as a joke or idle banter; and that his conduct was prejudicial to good order and discipline or of a nature to bring discredit upon the armed forces. As such, I would affirm the findings and sentence.

FOR THE COURT

KURT J. BRUBAKER
Clerk of the Court